**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA KULP,** | : | **CIVIL NO. 1:CV-08-1263** |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **WARDEN TOM DURAN, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Patricia Kulp ("Kulp") filed this counseled civil rights action pursuant to 42

U.S.C. § 1983 on July 2, 2008.  Named as Defendants are Tom Duran, the warden at the Clinton

County Correctional Facility ("CCCF"), Pennsylvania, and Clinton County.  Kulp alleges that

while confined at CCCF, Defendants denied her adequate medical care in violation of the Eighth

and Fourteenth Amendments.  Specifically, she claims that Defendants failed to provide care for

her knee beginning in early July of 2006.  She further contends that Defendants were deliberately

indifferent when there was a delay in taking her for x-rays and performing blood work that was

ordered.  Kulp maintains that as a result of the deliberate indifference to her medical needs, her

leg was subsequently amputated above the knee.  As relief she seeks compensatory damages.[1]

Pending before the Court is Defendants' motion for summary judgment. (Doc. No. 14.)  For the

reasons that follow, the motion will be granted.

---

[1] On August 11, 2008, in response to a stipulation filed by counsel, the Court issued an
order dismissing Court II of the complaint relating to state law claims and dismissing Plaintiff's
claim for punitive damages.  (Doc. No. 7.)

## I.    Background

Viewed in the light most favorable to Kulp, the facts are as follows.[2]  The Clinton County Correctional Facility has a policy in place regarding the provision of medical services to inmates which is provided to all correctional officers and the medical staff assigned by the Clinton Medical Associates ("CMA"), the contract medical care provider for CCCF.  (Doc. No. 14-3, Duran Dep. at 20; Ex. 3.)  While the medical policy indicates that the medical program is under the direction of the Warden, Defendants state that it is a collaborative effort between Warden Duran and Dr. Michael Greenberg, the CMA Medical Director.  (Id.)  The Deputy Warden for Treatment at CCCF is Jacqueline Motter.  She is responsible for inmate orientation and various inmate programs.  Inmate medical treatment, however, is the responsibility of medical personnel supplied to the prison by CMA.  (Doc. No. 14-4, Motter Dep. at 4-5.)

The medical personnel who work at CCCF are not employees of the County or CCCF.  They are contract employees assigned to CCCF through CMA, the contract provider.  (Duran Dep. at 13.)  While Kulp does not dispute this, she maintains that pursuant to prison policy, the Warden is responsible for the medical care rendered at the facility.  CCCF has a contractual agreement with CMA wherein CMA agrees to provide physician's services for three (3) hours per week, and a nursing staff for sixteen (16) hours per day.  (Duran Dep. at 13, Ex. 1.)  Dr. Michael Greenberg serves as the physician at CCCF pursuant to the agreement with CMA.  (Id. at 16.)  Karen Frederick and Jeannie Schaeffer are LPNs employed by CMA who are assigned to work at CCCF for Dr. Greenberg.  (Doc. No. 14-6, Frederick Dep. at 4-5; Doc. No. 14-7,

_____

[2]  The background facts rely primarily on the statement of facts submitted by Defendants, as most of the facts set forth therein have been admitted by Plaintiff and, as such, are not in dispute.  (Doc. No. 24, Pl.'s Resp. to SMF.)  Where facts are in dispute, the Court will so note.

Schaeffer Dep. at 5.)

Although the medical staff is employed by CMA, the facility itself has a policy through which inmates can receive medical care from CMA. Pursuant to the policy, an inmate receives an initial health screening at the time of his arrival and a physical examination within two weeks by a physician's assistant or doctor. (Doc. No. 14-3, Duran Dep. at 12, Ex. 3, Policy # 200-16) (Id. at 12.) If an inmate has a medical need during their incarceration, they are required to fill out a slip requesting to be seen in medical and describing their ailment. (Id.; Doc. No. 14-5, Kulp Dep. at 27.) This procedure is set forth in the Inmate Handbook provided to inmates upon their arrived at CCCF. (Doc. No. 14-4, Duran Dep. at 17; Ex. 2.) Any request slip is turned in by the inmate to the correctional officer on duty in their cell block. The officer then turns the slip into a lieutenant, who then provides it to medical personnel through the internal mail system or by placing it in the medical office. (Id. at 12; Kulp Dep. at 27; Motter Dep. at 8.) Neither the Warden nor the Deputy Warden review all requests made by inmates. (Motter Dep. at 8.)

Upon receipt of a sick call request by the nursing staff, the request is reviewed to determine whether it is an emergency, critical or non-critical. A sick call list is compiled and inmates are called to medical accordingly to be seen by the nurse on duty. (Doc. No. 14-6, Frederick Dep. at 29-30.) In a critical situation, the inmate is seen immediately. Otherwise, inmates who submit a request in the morning are called into medical after lunch. (Id.) If the request comes in after lunch, the inmate will be seen if it is an emergency. Otherwise, the inmate will be seen by the evening nurse or the following day. (Id. at 30-31.)

CMA staffs the facility with nurses from 7 a.m. to 11 p.m. (Frederick Dep. at 6.) The nursing staff conducts sick call several times a day, and inmates are seen based on the priority of

their requests. (Duran Dep. at 12.) Not every inmate is seen by a physician. If an inmate's condition deviates from the nursing staff's set of protocols, they are referred to the doctor. (Frederick Dep. at 15-16.) Dr. Greenberg is usually at the facility on Thursday afternoons. (Id. at 16; Kulp Dep. at 66.) If an emergency occurs and the doctor is not present, the nurse will send the inmate to the hospital. (Frederick Dep. at 16.)

In addition to conducting sick call times, nurses are in the cell blocks four (4) times per day on weekdays to distribute medication, and can discuss any medical concerns at those times. (Duran Dep. at 12, 14; Frederick Dep. at 13, 25 and 32; Kulp Dep. at 26-28; Doc. No. 14-8, Miller Dep. at 10.) Nurses try to see every inmate each day during medication disbursement. (Frederick Dep. at 13.) Kulp received medications from the nurse twice per day. (Kulp Dep. at 44.) If an inmate raises a medical concern with the nurse during medication disbursement, she will listen to the problem but direct the inmate to fill out a request slip, unless it is an emergency. Any conversation with an inmate during this time would not be noted in the records by the nursing staff. (Frederick Dep. at 25.)

If an inmate makes a medical complaint to a correctional officer, the officer would direct the inmate to fill out a request slip to be delivered to medical staff. If it was an emergency situation, the officer would document the complaint and then notify the medical staff. (Duran Dep. at 15-16, 26.)

Kulp was arrested seven (7) times for shoplifting prior to being incarcerated at CCCF. (Kulp Dep. at 10-12.) She was committed to CCCF on May 6, 2006, to serve a 10-20 month sentence. (Id.) While there, Warden Duran did not know her. (Duran Dep. at 9.) Following her arrival, she was given a physical examination on May 11, 2006. It was noted that she had a

history of osteosarcoma (cancer) to the knee, and two total knee replacements. (Duran Dep. at 24-25; Ex. 4). In addition, she suffered from Hepatitis C, and had a history of intravenous drug abuse. (Id.) While during the exam Kulp stated she had not engaged in heroin or cocaine use for two years, a drug test conducted at the time of Kulp's commitment was positive for marijuana and cocaine. (Doc. No. 14-13, Substance Abuse Admission/Denial Form.)

Kulp was seen in medical on the dates of May 8 and 12, 2006, but she was not seen by medical staff for complaints relating to leg pain until July 13, 2006. (Duran Dep. at 25; Ex. 4.) While Kulp admits this fact, she states that her condition was observed by correctional staff prior to July 13, 2006. She believes that she complained to several correctional officer about her condition between July 7, 2006 and July 13, 2006. (Kulp Dep. at 68-69.) When she complained to Officer Tippler, he told the nursing staff when they came in to dispense medications. (Id. at 70.) Officer LaRosa told Kulp to speak to medical. Another officer assisted Kulp in getting to the phone on one occasion. (Id. at 34-35.) Officer Blazina assisted her onto the medical table on the date she left CCCF. Kulp further states that her mother directly requested a medical furlough from Warden Duran on her behalf due to her condition. Kulp maintains that Duran failed to act upon the request. (Doc. No. 29, Kulp Dep. at 6-8.) Duran may have been aware of a medical furlough request since he recalls contacting Kulp's sentencing judge the weekend she went to the hospital, and following up with a letter dated July 18, 2006. (Duran Dep. at 41-42, Ex. 9.)

Deputy Warden Motter was involved in a disciplinary matter for Kulp which resulted in her placement in administrative segregation on July 6, 2006. (Motter Dep. at 8, 11; Duran Dep. at 34-35; Kulp Dep. at 29-30.) On this date Kulp was helping to deliver food trays within the

prison when she came upon her boyfriend's daughter, who was also incarcerated at CCCF. Kulp kissed her in violation of CCCF policy which does not allow inmates to touch one another. (Kulp Dep. at 21-22; Motter Dep. at 8-9; Duran Dep. at 36, Ex. 7.)

Kulp does not recall having any difficulty walking around the prison while distributing food trays on July 6, 2006. (Kulp Dep. at 23.) She did not require crutches, a wheelchair or any other assistance at that time. (Id.) Following the incident, Kulp was placed in segregation pending a disciplinary meeting with Motter and Correctional Officer Harris which took place on July 11, 2006. (Motter Dep. at 9-11.) According to the block movement logs Kulp did leave her cell block on July 7, 2006 to be seen in medical. (Duran Dep at 31.) According to the medical worksheets maintained by the medical staff, she received a Pegasys shot for her Hepatitis C on that occasion. (Id., Ex. 4.)

While an inmate is in lockdown they are confined to their cells for 23 hours a day. They are provided one hour for recreation, telephone use, visits or showers. (Motter Dep. at 10; Duran Dep. at 10, 38.) Such inmates are still permitted access to request slips and to be seen for sick call, separate from the one hour allowed for recreation. (Kulp Dep. at 30-31.) Segregated inmates are not limited in any way regarding medical treatment. (Frederick Dep. at 26.)

Prior to her disciplinary hearing, Kulp submitted a request slip to Motter apologizing for her infraction of the rules, and explaining her relationship with the other inmate that she had kissed. (Kulp Dep. at 23-25, Ex. 2; Motter Dep. at 10.) This is the same request slip that would be used to request sick call. (Kulp Dep. at 26.) Kulp believes that at the time she wrote the request slip apology to Motter she was in pain from her leg, and had directed request slips to the Warden and to medical about her condition. (Id. at 28, 33) Kulp believes her cellmate assisted

her out to the yard on July 11, 2006, the day of her disciplinary meeting. Kulp believes her leg was swollen and painful that day, but that she was able to walk with a limp. (Id. at 32.)

Motter released Kulp from disciplinary segregation following the hearing, and does not recall Kulp having made any medical complaint to her or request for medical attention during the July 11, 2006 disciplinary meeting. (Motter Dep. at 9-10, 14-15.) Kulp also does not recall discussing her condition that day with Motter. (Kulp Dep. at 33.)

Correctional Officer Thomas LaRosa believes that Kulp complained to him on two occasions that she had pain in her leg. While he does not recall when the complaints were made, he believes that at least one complaint came while she was in lockdown. (Doc. No. 14-9, LaRosa Dep. at 4-10, 15.) While he did not personally observe Kulp's leg at the time of the complaints, he did instruct her to fill out a medical request slip for the nurse. He then put the slips into the internal mail to be given to the lieutenant as per procedure. (Id. at 4-11.) LaRosa recalls seeing Nurse Schaeffer in the cell block talking to Kulp about her condition after the first request slip was turned in. (Id. at 12-13.) While he recalls seeing nurses come in to talk with Kulp on other occasions, he does not recall whether it was with respect to the second complaint she made to him.

Kulp believes that she started complaining about her knee on July 7, 2006, and is not sure whether Dr. Greenberg was present at CCCF between July 7, 2006, and when she saw him on July 13, 2006. (Kulp Dep. at 66-67.) On July 13, 2006, she complained of a painful knee that "goes out" on her, and stated that she had knee replacement surgery on two prior occasions. (Duran Dep. at 26, Ex. 4.) Defendants state there are no documents in Kulp's medical record or the prison's files which reflect any complaints of pain in her knee prior to July 13, 2006. Kulp

denies this statement. (Duran Dep. at 26-27, Ex. 4; Doc. No. 24, Kulp SMF ¶ 93.)

Between May and July 13, 2006, Kulp saw the nurses twice a day for medication, and one additional time every week for her shot. (Kulp Dep. at 62-63.) On July 13, 2006, following complaining to Nurse Frederick during medication disbursement about pain in her leg, Kulp put in a sick call request to be seen by Frederick. (Id. at 62.) Frederick examined her on that date, and observed no swelling or ecchymosis (bruising). She did not take Kulp's temperature. (Id. at 21.) Kulp denies that she had not made any prior complaints of pain to medical staff during sick call up until that time. (Doc. No. 15, Pl's SMF ¶ 100.) Defendants maintain that if she had, it would have been included in her CCCF medical records and there are no such notations. (Frederick Dep. at 8; Duran Dep., Ex. 4.)

After examining Kulp, Frederick recommended that she be seen by Dr. Greenberg because of her history of cancer and knee replacement. (Frederick Dep. at 9; Duran Dep. at 26, Ex. 4.) Greenberg saw Kulp the same day. Kulp states that her knee was painful and swollen, but that she does not believe she required assistance walking that day. (Kulp Dep. at 64.) Kulp believes she should have been sent to the hospital between July 7 and 13, 2006, and believes she expressed this to Greenberg on July 13, 2006. (Id. at 67-68.) Greenberg's notes from the July 13, 2006 appointment indicate that Kulp's joint was warm and tender, but does not indicate the presence of any swelling or redness. (Duran Dep., Ex. 4.) Kulp was given ibuprofen and blood work and knee x-rays were ordered. (Kulp Dep. at 64; Duran Dep. at 29, Ex. 4.) "Stat" was not indicated on the blood work order, and therefore it was the responsibility of the nurses to carry out the orders at their discretion. (Frederick Dep. at 9, 12.) After examining Kulp on July 13, 2006, Greenberg also directed the nurses to obtain Kulp's medical records from Shadyside

Hospital. Nurse Frederick did so the following day. (Duran Dep., Ex. 4.)

Frederick does not recall any correctional officers notifying her of any leg complaints made by Kulp, but no such record would have been made of any such reports because protocol requires that the medical staff be notified via the sick call request procedure. (Frederick Dep. at 18-19, 23-24.) Between July 13, 2006 and July 18, 2006, the medical progress notes do not indicate that Kulp was examined by any medical professional, but the "Med Sheet" reveals that she received a Pegasys injection on July 14, 2006. (Frederick Dep. at 22; Duran Dep, Ex. 4.) If an inmate was unable to walk to the medical room the shot could be given either at the inmate's cell or nurses would transport the inmate by wheelchair to the medical room. (Doc. No. 14-7, Schaeffer Dep. at 8.)

Usually Kulp received her shots in the medical room every Friday. She received injections on both July 7, 2006 and July 14, 2006. (Frederick Dep. at 26; Kulp Dep at 43-44.) The administration of the Pegasys injections by Nurse Schaeffer is noted on Kulp's medical sheet. (Schaeffer Dep. at 10, 26-27; Duran Dep., Ex. 4.) As such, Kulp was seen by a medical professional on July 14, 2006. The fact that Kulp was seen during medical disbursement on July 14, 2006 would not necessarily be reflected on the medical records. (Frederick Dep. at 31.) However, if Nurse Schaeffer had noted any problem with Kulp's leg when giving her the Pegasys shot, she would have documented this in the medical records. (Schaeffer Dep. at 9.)

Kulp claims she had to be assisted by two CCCF guards, Officers Zanghi and Lapriola, to the visiting room to see her mother and boyfriend on one occasion. Kulp submits the "Statement" of Zanghi wherein he states that he remembers Kulp from when he worked at the prison, and trouble she was having with her leg. He states that he and another officer had to help

her to the visiting room one time, and that "maybe it was in July or August of 2006." (Doc No. 24-3, Statement of Fred Zanghi.)[3]  Officer Lori Lapriola worked from 3 pm to 11 pm during the time Kulp was incarcerated in CCCF.  She does not recall ever receiving any complaint from Kulp of leg pain, or ever having lifted or assisted Kulp in walking around the facility.  (Doc. No. 14-11, Lapriola Dep. at 6-8.)

On another occasion Kulp states she had to be assisted by a correctional officer to get to the phone to call her mother.  This occurred on the same day she was due to receive a Pegasys shot from the nurse, who actually arrived at the cell block to give Kulp the shot while she was still on the phone.  (Kulp Dep. at 34-35.)  Kulp told the nurse that her leg was very painful and something needed to be done.  (Id. at 36.)  Kulp thinks the nurse informed her when the doctor would be in the facility again.

Kulp had visits from her mother on July 2, 13 and 16, 2006.  She had a visit from both her mother and her boyfriend on July 8, 2006.  (Kulp Dep. at 36-39, Ex. 3.)  Kulp is unable to remember which visit it was that she had to be carried to.  She does state that it was a visit where both her boyfriend and mother were present, and therefore believes it would have to have been on July 8, 2006.  (Kulp Dep. at 34, 39.)

The daily logs of CCCF establish that Officer Zanghi only worked on days in July where Kulp got visits from her mother.  According to Defendants, the logs reveal that Zanghi worked on July 2, 16, and 18, 2006, and that Officer Lapriola did not work on any of the days that Kulp

_____

[3]  The Court notes that the "Statement of Fred Zanghi" is neither signed by Zanghi or dated.  It is not sworn under penalty of perjury, and it is not a notarized affidavit.

had visits. ( Doc. No. 14-12, CCCF Daily Log.)  Kulp disputes these statements.[4]  (Doc. No. 24, Pl's SMF ¶¶ 138, 139.)

Kulp states she put in a request slip to the Warden sometime between July 13 and July 18, 2006, asking Duran to assist her in obtaining a medical furlough.  (Kulp Dep. at 81-82.)  She believes her mother also contacted the warden about a furlough during this time period.  (Id. at 82; Doc. No. 29, Ex. 1 at 6-8.)

On July 17, 2006, Kulp was transported to Lock Haven Hospital for the x-rays ordered by Dr. Greenberg.  (Duran Dep. at 38-39; Ex. 4.)  Nurse Frederick saw Kulp that same day before she went for the x-rays.  (Id., Ex. 4.)  Kulp was capable of walking with the assistance of the sheriff out to the transport van.  (Kulp Dep. at 74.)  While at the hospital Kulp never expressed a complaint or a need to anyone there for emergency treatment, nor did hospital personnel find it necessary to provide any emergency treatment.  (Id.)

Any delay between July 13, 2006, when Greenberg ordered the x-rays, and July 17, 2006, when Kulp was taken for the x-rays, would be due to the Sheriff's ability to transport Kulp there.  (Frederick Dep. at 10.)  Kulp admits this fact, but states that the Warden or other medical personnel has the ability in a "stat" situation to order quicker treatment at the hospital.  (Doc. No. 24, Pl's SMF at ¶ 153.)  The CCCF pass-on book reveals that the July 17, 2006 x-ray had been scheduled several days in advance, and Kulp was aware of it at least the day before.

The blood work ordered by Greenberg was drawn by the nursing staff at the prison on July 18, 2006.  Any delay between July 13, 2006, and the date the blood work was performed was attributable to the day of the week it was ordered, Kulp's need to fast prior to the draw, and

---

[4] Kulp does not cite to any evidentiary materials in support of her denial.

the need for the orders to be communicated to correctional officers on duty. (Frederick Dep. at 10-11.) Further, only Nurses Frederick and Reeder can draw blood and neither of them work on the weekends. (Frederick Dep. at 24.)

On this same date, Kulp was sent to the Lock Haven Hospital by Nurse Frederick because a situation arose with respect to Kulp's knee that Frederick believed to be an emergency. Upon examining the knee, Frederick observed swelling, redness and the spontaneous draining of serosanguineous fluid. Frederick also noted Kulp had a high temperature and complained of excruciating pain. (Frederick Dep. at 17, 20; Duran Dep. at 40, Ex. 4.) Frederick believed that Kulp may have an infection, and therefore contacted the physician for further instructions. (Frederick Dep. at 17.) These symptoms were different than those present on July 13, 2006. (Frederick Dep. at 22.)

Kulp was diagnosed at Lock Haven Hospital with septic arthritis in the total knee prosthesis. IV fluids and antibiotics were started. Kulp was transferred the following day to the University of Pittsburgh Medical Center-Shadyside for care by Dr. Goodman, who performed her previous orthopedic procedures. Cultures performed at that time and throughout her following hospitalizations were positive for methicillin-sensitive Staphylococcus aureus (MSSA). (Doc. No. 14-16, Silverman Expert Report at 4; Doc. No. 14-15, UPMC records dated 7/20/06, 7/25/06, 9/6/06, 9/7/06, 9/10/06, 9/28/06 and 11/17/06.) However, Kulp denies that she had a MSSA infection, and argues that medical records indicate that she had contracted MRSA, methicillin-resistant Staphylococcus aureus.[5] Over the next six (6) months, Kulp underwent multiple surgeries and courses of antibiotics. On January 22, 2007, an above knee amputation

_____

[5] In disputing this fact, Kulp fails to cite to any specific supporting evidentiary materials.

was ultimately performed due to the persistent infection.  (Id., UPMC records dated 1/30/07.)

An expert report submitted by Michael L. Silverman, M.D., Division of Infectious Diseases at Presbyterian Medical Center states that Kulp's infection was related to her use of intravenous drugs, along with concurrent treatment of Hepatitis-C.  In addition, Kulp was at a high risk for complications to her knee given her medical history of Hepatitis-C, intravenous drug use and poorly maintained health.  (Doc. No. 14-16, Silverman Report at 4.)  The infection was unrelated to the care rendered to her at CCCF.  Her treatment at CCCF leading up to her hospital admission on July 18, 2006, was found to be appropriate given the lack of symptoms of infection prior to that time.  (Id.)  Kulp was immediately sent to the hospital when the symptoms were noted, and give appropriate treatment prior to that time for the symptoms noted.  (Id.) Kulp denies these facts, and claims Kulp had contracted MRSA.[6]  Other possible sources and factors contributing to Kulp's infection that were noted by Kulp's treating physicians include her knee replacement, pre-incarceration dental surgery, and poor oral hygiene.  (Doc. No. 14-15, Medical Records of UPMC dated 7/25/06, 10/3/06, 10/8/06, 11/17/06 and 1/30/07; Lock Haven Family Practice dated 10/19/06; Lock Haven Hospital dated 7/18/06.)

Warden Duran was contacted regarding Kulp's transfer to the hospital after it occurred. (Duran Dep. at 41.)  He was not aware of any issues with Kulp's condition until she was transported to the hospital for admission on July 18, 2006.  Neither he nor Deputy Warden Motter were aware of any officer having to carry Kulp around the facility due to an inability to walk.  (Duran Dep. at 45-46; Motter Dep. at 17.)  No medical records exist documenting that Kulp had to be carried around the facility.  (Frederick Dep. at 23.)  In addition, Duran denies

---

[6]  Again, no evidentiary materials are submitted in support of this disputed fact.

receiving any notes from Kulp regarding her condition. If he had received any such note, he would have forwarded it to medical for them to address. (Id. at 42-43.) Kulp's mother states, however, that she complained to the Warden about her daughter's condition. (Doc. No. 29, Pl.'s Supp'l Br., Ex. 1, Kulp Dep. at 6-8.)

Defendants move for summary judgment. In support thereof they submit a brief, a statement of undisputed material facts and supporting evidentiary materials. (Doc. Nos. 15, 16.) Included in the evidentiary materials are numerous depositions with attached exhibits, the Clinton County Correctional Facility Daily Log spanning the time period from July 1, 2006 through July 19, 2006, medical records from the Lock Haven and the University of Pittsburgh Medical Center Presbyterian Shadyside Hospitals, and the medical expert report of Michael L. Silverman, M.D. (Doc. No. 14, Exs. 14-1 through 14-16.) Kulp has filed an opposing brief and statement of facts. In support of the opposing statement of facts are excerpts from the deposition of Plaintiff's mother Patricia Kulp, and the unsigned, unsworn statement of Fred Zanghi, formerly employed as a correctional officer at CCCF. (Doc. No. 23, Exs. 23-2 and 23-3.) A reply brief was thereafter submitted by Defendants. (Doc. No. 26.) Plaintiff's request for leave to submit a supplemental opposition brief was later granted. The brief attached additional excerpts from the deposition of Kulp's mother, as well as a portion of the deposition testimony of Attorney Stephen Smith, Kulp's state criminal attorney. (Doc. No. 29.) Defendants have filed a supplemental reply brief. (Doc. No. 30.)

## II.    Standard of Review

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ P. 56(c); Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  In considering a motion for summary judgment, inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party.  P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006).

Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the nonmoving party's case.  Celotex Corp. v. Caltrett, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the burden shifts to the nonmoving party, who "may not rely merely on allegations or denials in its own pleading."  Fed. R. Civ. P. 56(e)(2); Saldana, 260 F.3d at 232.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must "set out specific facts showing a genuine issue for trial."  Fed. R Civ. P. 56(e)(2).  Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment.  Id.  Even so, "all that is required [by Rule 56(e)(2)] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288-89 (1968).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  Allegations made without any evidentiary support may be disregarded.  Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## III. DISCUSSION

In order to survive a motion for summary judgment on a § 1983 claim, Kulp must show that Defendants acted under color of state law, and that she was deprived of a federal constitutional right. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). It is well-established that civil rights claims cannot be premised on a theory of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim. See Rizzo v. Goode, 423 U.S. 362 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). Liability cannot be premised solely on the basis of a defendant's supervisory capacity, that is, there must be allegations that the official had knowledge or acquiesced in any purported acts of constitutional mistreatment.

The constitutional deprivation alleged in this case is inadequate medical care in violation of the Eighth Amendment. The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192,197 (3d Cir.1999)(citing Estelle v. Gamble, 429 U.S. 97 (1976)). In order to establish a violation based on the Eighth Amendment, "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

A serious medical need is "one that has been diagnosed by a physician as requiring

treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). The "deliberate indifference" standard is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 841. Only egregious acts or omissions can violate this standard. See White v. Napoleon, 897 F.2d 103, 108-10 9 3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ." Estelle, 429 U.S. at 106. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." Spruill, 372 F.3d at 235. An inmate's disagreement with medical treatment also does not rise to the level of "deliberate indifference." See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987).

If a prisoner is under the care of medical experts, non-medical prison officials are justified in believing the prisoner is being treated properly and is in capable hands. Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). "Absent a reason to believe (or actual knowledge) that ... doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison

official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id. at 236; Durmer, 991 F.2d at 67. Non-medical personnel cannot be held to be deliberately indifferent merely because they fail to respond to complaints of an inmate already being treated by prison medical staff. Gusman v. Bureau of Prisons, 231 Fed. App'x 179, 181 (3d Cir. 2007). In the absence of some indication that treatment is not occurring or was inappropriate, the non-medical prison official cannot be found deliberately indifferent. Spruill, 372 F.3d at 236.

### A.    Supervisory Liability

At the outset, the Court emphasizes that Kulp brings this action only against Warden Duran and Clinton County, neither of whom were directly involved in her medical care. Rather, Defendants are responsible for the operation of CCCF, where Kulp was incarcerated. The medical personnel who responded to Kulp's needs are not Clinton County or CCCF employees. They are individuals employed through a contract agreement between Clinton County and Clinton Medical Associates, and are not named as Defendants in this action. Kulp seeks to impose liability upon the named Defendants in a supervisory capacity.

### 1.    Clinton County

In a Section 1983 case, respondeat superior liability does not exist, and the plaintiff must show that her injuries were caused by a policy or custom established by the defendant municipality. Defendants seek summary judgment in favor of Clinton County based on the undisputed record which reveals that (1) an inmate medical care policy ensuring that inmates received all necessary medical care was in place and followed at CCCF and (2) that Kulp presents no evidence to show that these policies regarding medical treatment were inappropriate

or unconstitutional. Kulp attempts to impose liability on Clinton County by arguing that a custom of delaying medical treatment for inmates existed at CCCF.

The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389 (1989). "In enacting § 1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 399 (1997). In order to prevail on such a claim, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Id. at 403. Liability attaches either to an official policy or to a "custom" that constitutes a "practice ... so widespread as to have the force of law." Id. at 404.

In the instant case, the undisputed facts demonstrate that specific procedures were in place at CCCF with respect to the provision of medical services to inmates. From the time of their initial intake at the prison throughout their confinement there, policies were in place setting forth the procedure for submitting a sick call request to be seen by medical personnel. This process was not altered even if inmates were confined in segregation. Kulp does not dispute the policy to be followed. She also admits that she was able to speak to correctional officers at any time, and raise a medical concern. If it was not an emergency situation, the inmate would be directed to follow policy and fill out the required request slip. However, if the medical need was urgent, the officer would notify medical personnel directly. Kulp also does not dispute that

nurses visited the cellblocks four (4) times per day during the week to distribute medications and that medical concerns could be raised at these times as well. Again, in a non-critical situation, the inmate was requested to fill out a request slip. If the medical need was an emergency, the nurse would respond accordingly.

Kulp received medications twice each day, as well as received a Pegasys shot each Friday. It is undisputed that there were adequate opportunities for her to raise any medical concern each day. The undisputed evidence further establishes that when Kulp did complain to correctional officers on several occasions, they either assisted her in filling out request slips or personally spoke to the nursing staff on her behalf. Further, when Kulp filled out a request slip she was seen by medical personnel, specifically Nurse Frederick. Because of Kulp's history, she referred her Dr. Greenberg the very same day, which was a Thursday. The undisputed evidence establishes that Greenberg noted no swelling or redness, prescribed ibuprofen and ordered blood work and a knee x-ray. The x-ray occurred on July 17, 2006, and the blood work took place the following day. Kulp admits in her response to Defendants' statement of material facts that the time span between when she was seen by Greenberg and when the x-rays and blood work occurred was attributable to the fact that Greenberg did not specify "stat" on his orders, and that the scheduling by the nurses would be in conjunction with the availability of the sheriffs for purposes of transport.

Kulp fails to submit any evidentiary materials in support of her allegation that any policy, custom or practice of undue delay in treating inmates existed at CCCF that was so widespread so as to impose municipal liability on Clinton County. There is no evidence submitted demonstrating that Defendants failed to follow procedures, wantonly ignored policy or that the

medical treatment policy in place was inadequate or in any way deliberately indifferent to Kulp's serious medical need. Viewing the record as a whole, there is no evidence upon which a reasonable jury could find that a municipal policy or custom existed whereby Clinton County was deliberately indifferent to Kulp causing her injury. As such, summary judgment is warranted in favor of Defendant Clinton County.

### 2. Warden Duran

Kulp also seeks to impose liability on Warden Duran on the basis of deliberate indifference to her medical needs in violation of the Eighth Amendment. Defendants move for summary judgment on the basis that Duran neither personally participated in Kulp's medical care while confined at CCCF, nor is there any evidence supporting the finding of supervisory liability on his part.

Supervisory personnel are only liable for the § 1983 violations of a subordinate if they knew of, participated in or acquiesced in the subordinate's unconstitutional conduct. Capone v. Marinelli, 868 F.2d 102, 106, n.7 (3d Cir. 1989), citing Hampton v. Holmesburg Prison Officials. Further, the Third Circuit Court of Appeals has established that a supervisor can be held liable because his policies or practices led to an Eighth Amendment violation where the plaintiff identifies a specific policy or practice that the supervisor failed to employ and shows that (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001).

In the instant case, Kulp argues that Duran had actual knowledge of, and was deliberately

indifferent to, her medical needs. Duran seeks summary judgment on the basis that Kulp fails to come forth with any evidence that he failed to employ any policy or practice that led to an Eighth Amendment violation, or that he was aware of and disregarded any substantial risk of serious harm. In support of his argument Duran states that he did not know Kulp during her incarceration at CCCF, and had no knowledge that Kulp was having pain in her legs in early July of 2006. Further, he never received any request slips regarding her medical condition or a note from Kulp in early July 2006 requesting a furlough to UPMC. He cites to Kulp's failure to produce any evidentiary materials in support of her allegations, and also to the lack of any documentation in the medical records of complaints of leg pain prior to July 13, 2006. (Duran Dep. at 25; Ex. 4.) He states he had no knowledge of Kulp being carried at any time from location to location within the prison due to an inability to walk, and points to Kulp's lack of any evidentiary support for her assertion that he did or should have possessed such knowledge. (Id. at 45.) While Duran does state that he did send a letter to Judge Saxton, Kulp's sentencing judge, on July 18, 2006, inquiring about the possibility of early release on parole, this followed Kulp's admittance to the hospital and was based on her history and the cost being incurred by the county for her monthly medication and current hospitalization. (Id., Ex. 9.)

In opposing Defendants' motion Kulp basically asserts three arguments in support of her position that Duran had notice of her medical condition. She first maintains that although she was not seen in medical for leg pain complaints until July 13, 2006, her condition was observed by various correctional officers prior to that time. However, even if it is undisputed that she may have made complaints to Officers Tipler, LaRosa, Hillyer and Blazina between July 7, 2006 and July 13, 2006, the undisputed record demonstrates that said officers either instructed Kulp to fill

out a sick slip or informed the nursing staff.

Kulp also contends that she had to be carried to the visiting room on one occasion by correctional officers, one of whom was Officer Fred Zanghi, a former correctional officer at CCCF. She does not recall when this occurred, but states that it was on an occasion when both her mother and her boyfriend were present. She believes it must have been on July 8, 2006. (Kulp Dep. at 34.) Kulp submits a statement made by Zanghi wherein he states that he knew Kulp and believes "maybe it was July or August 2006, she was having trouble with her leg," and he and another officer had to help her to the visiting room on this one occasion. (Doc. No. 24-3.)

First, Zanghi's statement has no evidentiary value. It is not signed and it is not a declaration made under penalty of perjury or a notarized affidavit. Further, Defendants have submitted evidentiary materials which establish that Zanghi was not working on the date Kulp states this visit must have occurred (Doc. No. 14-12 at 25-32; Daily Log), as well as evidence that Kulp's family was also at the prison visiting on July 18, 2006. Kulp fails to submit any evidentiary materials controverting Defendants' submissions.

Regardless, however, of whether issues of fact exist with respect to Kulp's complaint to correctional officers or when she was carried to the visiting room, there is no evidence in the record establishing any awareness of these incidents on the part of Duran. The record is completely devoid of any facts even suggesting that Duran should have known or did know of Kulp's medical condition, and therefore, he could not have disregarded any substantial risk of harm to her.

Kulp next argues that Duran was aware of her medical condition due to a telephone call made by her mother, Patricia Kulp, requesting a medical furlough on her behalf. Kulp submits

excerpts from her mother's deposition transcript will establish the following.  Kulp's mother contacted the warden by phone because her daughter was carried into the visiting room, and she "didn't think this was right."  (Doc. No. 29, Kulp Dep. at 6.)  She is uncertain as to when this call occurred, but believes it was probably the week before her daughter was hospitalized on July 18, 2006, sometime between July 13 and 18, 2006.  She also believes it was the day after she saw her daughter carried into the visiting room.  Her purpose in contacting the warden was to request a medical furlough for her daughter since she was unable to walk.  The only other time she claims to have spoken to the warden was immediately following her daughter's arrival at CCCF, and it was with regard to the requirement that her daughter work.  She does not recall the details of this conversation.  (Id. at 11.)

The deposition testimony of Kulp's mother does not create any genuine issues of material fact with respect to whether Defendant Duran had sufficient notice of an excessive risk to Kulp's health or safety.  All this testimony establishes is that Kulp's mother called the warden immediately following her incarceration at CCCF in May of 2006 to complain about the work requirement, and then later in July of 2006 to request a medical furlough because her daughter was carried into the visiting room.  There are simply no facts in the record which establish that Kulp's mother put Duran on notice that her daughter had a serious medical condition with respect to her knee, and that said condition was not being adequately addressed at the prison.  Further, at the time Kulp's mother believes she contacted the warden to request a medical furlough, the undisputed record reveals that Kulp was receiving medical treatment at the prison.  The record is also undisputed that Duran telephoned Kulp's sentencing judge a day or two prior to her hospitalization on July 18, 2006, and then followed up with a letter to him on July 18, 2006,

inquiring about the possibility of Kulp's early release on parole.  (Duran Dep. at 41-42, Ex. 9.)

Finally, Kulp submits excerpts from the deposition transcript of Stephen Smith, her state criminal attorney.  This testimony is also offered for the purpose of demonstrating Duran's awareness of Kulp's medical condition and her inadequate medical care at the prison.  It is clear that Smith's testimony does not create a jury question.  Smith testifies that Kulp contacted him with respect to the issue of obtaining a medical furlough.  While he does not recall the specific reasons for the request, he believes she states she was having medical problems and was not being treated properly.  (Doc. No. 29, Smith Dep. at 10.)  While Smith states that if he received a request like this from a client he would normally contact a warden, he does not specifically recall ever speaking to Duran about a medical furlough for Kulp.  In fact, in response to a question as to whether he discussed the matter directly with the warden he states "I may or may not have . . . but I can't say in this case I did."  (Id. at 16.)

Based on the foregoing, it is clear that the record does not set forth any disputed issues of fact with respect to whether Duran knew of, participated in or acquiesced in the inappropriate medical treatment for any serious medical condition of Kulp.  Kulp has failed to come forward with any evidence establishing that Duran was put on sufficient notice of Kulp's condition and any excessive risk to her health or safety.  For these reasons, the Court finds summary judgment warranted with respect to Kulp's claim against Duran based upon supervisory liability.

### B.  Deliberate Indifference

When the Court examines the record in its entirety, even if Kulp could establish knowledge on the part of Defendants, it is clear that she has not carried her burden of demonstrating that there is a genuine issue of fact with respect to the existence of deliberate

indifference regarding her medical treatment. The undisputed facts reveal that Kulp worked delivering food trays on July 6, 2006, and she admits she had no difficulty doing so. She received her Pegasys injection from the nurse the following day, and made no complaints regarding any problem she was having with her knee. From July 6 through July 11, 2006, Kulp was confined in administrative segregation and although she was able to file sick request slips, there is no evidence that she did so. However, Kulp did utilize the same type of slip to submit an apology to Deputy Warden Motter regarding her disciplinary infraction. Further, while Kulp states in her deposition that on July 11, 2006, her knee was painful, swollen and she was limping, she made no complaints about her knee or the lack of medical treatment at her disciplinary hearing before Motter on that very same day.

The undisputed record further reveals that although Kulp admits knowledge of the procedure in place for requesting medical treatment and the availability of raising any medical concerns with the nurses during the two times each day they distributed medication to her, there is nothing in the record indicating that she did either. While Kulp did submit a sick request slip on July 13, 2006, she was subsequently seen on this date by Nurse Frederick, and then referred to and examined by Dr. Greenberg. Greenberg prescribed ibuprofen and ordered tests based upon Kulp's complaints and his observations. Any disagreement with the treatment received or any allegations of medical malpractice do not rise to the level of deliberate indifference. Further, any complaints about the delay in receiving the tests ordered or Kulp's belief that she should have been sent to the hospital that day do not amount to deliberate indifference based upon the undisputed facts contained in the record. The medical records reveal that Greenberg did not note any swelling or redness upon his examination of Kulp on July 13, 2006, and also that he did not

order that the tests be performed "stat." Any error on Greenberg's part would amount to negligence at best. Further, the tests were performed within several days of when they were ordered. In her opposing statement of material facts, Kulp even admits that if an order for blood work was given on a Thursday, it would be reasonable for the blood work not to take place until the following week. The undisputed record also reveals that on the day following Kulp's examination by Greenberg, she saw Nurse Schaeffer for her Pegasys injection and never voiced any complaints about her knee condition. It is further undisputed that when Kulp's symptoms changed on July 18, 2006, she was immediately sent to the hospital because it was an emergency situation.

Based on the foregoing, even if any type of knowledge was established on the part of Defendants regarding Kulp's knee condition, there are no disputed issues of fact indicating a triable issue on deliberate indifference. First, the undisputed evidence shows an appropriate, constitutional response to Kulp's condition by prison staff. Since she was under the care of medical personnel, the non-medical Defendants were justified in believing that Kulp was being treated properly absent a reason to believe or knowledge otherwise. Although Duran states that he never even knew Kulp while she was an inmate, if he had inquired he would have discovered that Kulp was, in fact, being treated. Defendants cannot be found to be deliberately indifferent in the absence of some indication that treatment was not occurring or was inadequate.

Further, based on the undisputed record there is nothing to establish that the medical staff itself was deliberately indifferent to Kulp's medical condition. As previously discussed, while Kulp points to the delay in performing the tests and Greenberg's failure to send her to the hospital on July 13, 2006, these allegations amount to negligence at best as there are no facts which would

support even an inference of deliberate indifference on the part of the medical personnel in making these decisions. Clearly, if the underlying medical staff is not deliberately indifferent, summary judgment in favor of the non-medical defendants on this issue is warranted.

Kulp contends that she contracted MRSA as a result of her incarceration, and that the delay in admitting her to the hospital caused the ultimate loss of her leg. There is no support for this position in the record. The medical records submitted, including those of Kulp's own physicians, clearly establish that Kulp was diagnosed with MSSA, not MRSA, and document that the source of the infection was likely caused by Kulp's poor dental hygiene. (Doc. No. 14-15 at 20, 22, 24 and 26.).[7] The expert report submitted by Michael L. Silverman, M.D., following review of Kulp's medical records, notes that the antibiotic therapy that Kulp received, as well as her medical treatment at CCCF, were all within the standard of care for MSSA. His report states that Kulp's infection was related to circumstances other than her incarceration including her previous use of intravenous drugs along with concurrent treatment of hepatitis C, and was unrelated to the care rendered to her at CCCF. In Silverman's opinion, Kulp was a high risk for complications given her underlying medical history of hepatitis C, intravenous drug use and poorly maintained health which was well documented throughout the medical records. (Doc. No. 14-16 at 4.)

Kulp presents no contravening evidence and fails to make any showing establishing

_____

[7] A report by Carrie A. Timko, M.D., Kulp's medical doctor who saw her on October 19, 2006, states that ". . . they have pulled all of her teeth, as the source of the recurrent staph infection and she is being treated again with daily IV antibiotics." (Doc. No. 14-15 at 22.) Kulp's discharge report on January 30, 2007, following the amputation states that she had developed ". . . a septic joint probably due to multiple dental abscesses with subsequent total dental extraction." (Id. at 26.)

deliberate indifference on the part of any medical staff member. She also fails to establish any causal connection between her treatment at CCCF and her resulting injury. There is no evidence in the record on which a reasonable juror could find that Clinton County or Warden Duran was previously on notice and chose to disregard a substantial risk to Kulp's health. For these reasons, their motion for summary judgment will be granted. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


PATRICIA KULP,              :      CIVIL NO. 1:CV-08-1263
         Plaintiff,            :
                                :       (Chief Judge Kane)
         v.                  :
                                :
WARDEN TOM DURAN, et al.,    :
         Defendants        :


## O R D E R

**NOW, THIS 31st DAY OF MARCH, 2010,** for the reasons set forth in the

accompanying Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendants' Motion for Summary Judgment (Doc. No. 14) is **GRANTED**.
   The Clerk of Court is directed to enter judgment in favor of Defendants.

2. The Clerk of Court is directed to **close this case**.



                     **S/ Yvette Kane**
                     YVETTE KANE, Chief Judge
                     Middle District of Pennsylvania